**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SENA GADAGBUI,

                                                    Case No: 1:19-cv-48

                    Plaintiff,                      Bowman, M.J.

        v.

UPSIDE INNOVATIONS, LLC,

                    Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sena Gadagbui ("Gadagbui") filed suit against her former employer, alleging that Upside Innovations, LLC ("Upside") engaged in unlawful discrimination when Upside fired her after she informed Defendant that she was pregnant.[1]  Defendant has filed a motion for summary judgment.  On July 10, 2020, counsel appeared before the undersigned for oral argument.  For the following reasons, Defendant's motion will be GRANTED.

**I.      Standard of Review**

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[1]The parties have consented to the exercise of plenary jurisdiction by the undersigned magistrate judge. *See* 28 U.S.C. § 636(c).

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505 (1986). The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251–52, 106 S.Ct. 2505. To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## II.      Findings of Fact

Plaintiff filed suit after she was informed that her position was being eliminated. The parties have agreed on some, but not all, findings of fact.  (*See* Docs. 23-1, 25-1). Pursuant to the above standards, where any dispute exists, all reasonable inferences have been construed in Plaintiff's favor.

Upside is a small business that sells wheelchair ramps, ADA compliant steps, OSHA stair systems, stair systems, and canopy and walkway covers.  Kevin Sharp is the President of Upside.  Upside works with a third party placement agency, Vernovis, Ltd., to assist with interviews and recruiting.  Peter Olmstead, an employee of Vernovis, helped Upside screen applicants for an Accounting and Human Resources Manager after Amy Langford, who held the position, accepted a job with another company.

In December 2017, Gadagbui applied for that position.  The duties of the position included: completing month-end accounting transactions; providing weekly financial analysis regarding company performance; processing weekly payroll; processing prevailing wages; analyzing customer credit applications; managing banking relationships; ensuring the company stays within cash flow plans; providing information and answering questions regarding annual tax filings to the company's accounting firm; working with the president to develop annual plan; and managing direct report and any audits as needed.  After interviewing Gadagbui, Sharp concluded that she did not have broader accounting experience and would be "pretty green" on the "HR portion," but "from a technical skills perspective … will be fine with the accounting and finance portion of the position…."  Others, including Langford, agreed.

Plaintiff had little experience in several accounting tasks that she was expected to perform and required training.  Langford left Upside close in time to Gadagbui beginning

her employment but was paid to help train Gadagbui after she left.[2]  Sharp testified that after Plaintiff began work on January 2, 2018, he quickly realized her deficiencies, and by February 6, 2018 knew that Upside was "in some trouble" with Plaintiff's perceived lack of accounting skills.  He believed that Gadagbui either did not have the necessary knowledge to perform basic cash balancing or did not realize the urgency to complete it on a timely basis.

Plaintiff testified that "I'm sure I made mistakes, but I would always be sure to ask Kevin or Amy for help."  (Doc. 18 at PageID 140).  She states that any errors were mere "clerical mistakes."  (Doc. 25-1 at Finding 7). Plaintiff admits that she did not close the books at the end of January, but asserts that delay was due to the fact that December had not been closed when she began employment.  Gadagbui attributes perceived deficiencies in her performance to Upside's failure to provide her with adequate training. (*See* Doc. 18 at PageID 148-150).

By February 7, 2018, Upside began searching for an accounting consultant to assist with its accounting backlog and to train and evaluate Gadagbui.  Upside returned to Vernovis to identify candidates who could "setup proper processes, procedures, and evaluate/mentor the current person who is in the role."  (Doc. 22 at PageID 499).  On February 12, 2019, Vernovis posted an Accounting & Finance Service Contract job.  The advertisement read, in part:

> The company has decided to launch Mei Trak ERP system.  They need a resource to come in, help setup the chart of accounts, map data from the old system to the new system, map out what needs to go where, setup the cost accounting.  Start ASAP – go 60 days or so.  Currently they have an accountant.  They are not sure if they are the right fit yet.  Our consultant would also setup the proper processes, procedures and evaluate/mentor

---

[2] *Compare* Doc. 18 at PageID 145 (Plaintiff's testimony that she and Langford worked together for two to five days prior to Langford's departure) with Doc. 22 at PageID 376-377 (Sharp's testimony that there was not an overlap but that Langford came in "a couple times" after Plaintiff began work).

4

the current person who is in the role.  <u>If that person isn't the right fit, they</u>
<u>will be looking for another resource… of which the consultant may be</u>
<u>considered for that.</u>

(Doc. 22 at PageID 500, emphasis added).

 On February 14, 2018, <u>after</u> Upside sought out a consultant to help train and
evaluate her performance, Gadagbui first informed Upside that she was pregnant.
Gadagbui indicated her pregnancy was a surprise and that she was not initially happy
about it.  Sharp and Amy Gogul, Upside's Director of Operations, exchanged the following
contemporaneous messages:

> [Sharp:]  I wasn't really sure how to react to Sena's news today.  She didn't
> seem to[o] excited.  After she said something like, "I was breastfeeding and
> wasn't having my menstrual cycle so I didn't think this would happen."  I
> think my response was "Well there is quite a bit of general understanding
> how these things happen."  Super awkward conversation!!!!
> …
>
> [Gogul:]  My conversation with Sena was very similar… very awkward.

(Doc. 23-1 at Finding 15).  Sharp also sent the following message to Langford:  "Sena
told me that she's 15 weeks pregnant.  It was a very awkward conversation.  She didn't
seem to be happy, so I was not sure what my response was supposed to be…" (Doc. 22
at PageID 528).

On February 23, 2018, Sharp was informed that a candidate had been found "who
can help [Upside] catch up on our accounting backlog, assist in the ERP accounting
transition and help Sena while assessing whether or not she is able to execute in this
role."  (Doc. 22 at PageID 532-533).  On March 5, 2018, Upside hired Victor Crainich III
through Vernovis as an accounting consultant.  Crainich accepted the 30-60 day contract
position with understanding that he was to train and assess Gadagbui, as well as perform
other accounting tasks described in the job post.

When Crainich began work in early March, Sharp had completed the 2017 year-end closing but Gadagbui still had not completed the January or February 2018 month-end closings.  Therefore, he and Gadagbui worked to complete those closings.  Crainich testified he taught Gadagbui how to properly close a month. (Doc. 20 at PageID 305-306, 309-310).  Crainich created additional accounting processes and Gadagbui was receptive to the training that he provided.  However, Crainich evaluated Gadagbui's accounting abilities and capabilities negatively, concluding that she was not qualified for the position. He communicated his assessment to Sharp.

Soon after Crainich began, Sharp determined that he had superior accounting skills not only to Gadagbui, but that Crainich was also superior to Amy Langford, Plaintiff's predecessor.  Sharp testified that observing Crainich allowed him to appreciate the type of accounting services that could be provided, which he previously did not know existed. For example, Crainich began providing Sharp with new reports showing cash flow, short-term cash forecasting, and long-term cash forecasting.  (Doc. 22 at PageID 443-446).

Comparing the assessment of Plaintiff with his more favorable evaluation of Crainich, Sharp concluded that Gadagbui could not provide the type of accounting services Upside needed. Sharp and others began discussing how Upside should restructure the Accounting Department, including whether or not to retain or eliminate Plaintiff's position and/or a separate accounting assistant position then occupied by Alex Williams.  Sharp determined that Upside should create a new Controller position and eliminate either Williams or Gadagbui or possibly both, and went "back and forth" on that decision until shortly before he terminated Gadagbui.  (Doc. 22 at PageID 441-442, 459-460).  Sharp testified that he decided to keep Williams in the accounting assistant role to support the Controller.

6

On March 26, 2018, Upside hired Crainich into the newly created, permanent position of Controller to handle higher-level accounting functions. (Doc. 22 at PageID 443-446, 452-456 and 570). That same day, Sharp sent Olmstead an email stating his intention to eliminate Gadagbui's position. In the email, he attached Gadagbui's job description and asked Olmstead to create a job description for the new Controller position. When finalized, the Controller description required 7 years of accounting experience and a CPA, both of which Crainich possessed but Plaintiff did not. (Doc. 22 at PageID 578). On March 29, 2018, Sharp notified Gadagbui that her position had been eliminated and that her employment was being terminated effective immediately.

Plaintiff disputes that the Controller position was created out of business necessity and maintains instead that it was created as a pretext to terminate her. However, Upside did not hire a direct replacement for Plaintiff and has continued to employ a Controller since terminating Plaintiff.

On April 9, 2018, Plaintiff filed an EEOC Charge that alleges that she was terminated based upon her sex (female) and condition of pregnancy, based upon Defendant's hiring a male consultant on a date shortly after Defendant learned of her pregnancy, and her subsequent termination. (Doc. 18 at PageID 288). After receiving her "Right to Sue" Notice, Plaintiff timely filed a federal complaint alleging that she was terminated based upon her pregnancy.[3]

### III. Analysis

### A. Plaintiff's Burden to Establish a Prima Facie Case

Plaintiff's complaint alleges that Defendant discriminated against her based upon

---

[3]Plaintiff does not argue here that Upside discriminated against her in any way independent of her pregnancy.

her pregnancy, in violation of Title VII, 42 U.S.C. § 2000e(k) et seq. and the Ohio Civil Rights Act, O.R.C. § 4112.01 *et seq.* In the absence of any direct evidence of discrimination,[4] Plaintiff must prove her claims through indirect or circumstantial evidence. Under the indirect evidence framework, the plaintiff first has the burden of proving a prima facie case of discrimination; if she is successful, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions; finally, the plaintiff has the opportunity to prove that the proffered reason is pretextual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817 (1973). "On a motion for summary judgment, a district court considers whether there is a sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Latowski v. Northwoods Nursing Center*, 549 Fed. Appx. 478, 483 (6th Cir. 2013) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

To prove her prima facie case here, Plaintiff must show: (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline*, 206 F.3d at 658. Plaintiff was pregnant, and began working as Upside's Accounting and Human Resource Manager in January 2018 before being terminated less than three months later. Solely for the purposes of the pending motion, Defendant "assumes" that Plaintiff can establish her prima facie case. (Doc. 23 at 12). In light of this concession, the burden shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for its actions.

---

[4]Plaintiff does not argue that she has direct evidence to prove her claims.

### B.  Upside Articulated a Facially Neutral Articulated for Termination

Plaintiff argues that Upside has not clearly articulated a legitimate, non-discriminatory reason for her termination.  The undersigned disagrees.  At the March 29, 2018 termination meeting, at which Olmstead was present, Sharp told Gadagbui that he "could not afford both [Crainich] and me" and that he had "made a mistake." (Doc. 18 at PageID 205, 210).  Upside stated that the company had re-evaluated its needs and was moving in a different direction, with the elimination of her position effective immediately, but that Upside would pay her severance pay.  A termination letter provided to Plaintiff at the time similarly stated that Upside had decided to eliminate Plaintiff's position after a "reevaluation of the needs of the business and the redesign of the Accounting and Finance function."  (Doc. 18 at PageID 209, 286).   It is undisputed that Upside hired Crainich into a newly created Controller position.  While Plaintiff may argue that the Defendant's articulated reasons for the elimination of her position were a pretext for discrimination, the articulated reasons are facially neutral.

### C.  Plaintiff Fails to Raise a Genuine Issue of Material Fact on Pretext

Because the Defendant has articulated a legitimate reason for its termination of Plaintiff, in order to survive summary judgment, Plaintiff must come forward with enough evidence to create a genuine issue of material fact about whether the Defendant's stated reasons were in fact pretextual.  *See Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001).  The evidence must be sufficient that a "jury may reasonably reject the employer's explanation."  *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078,1083 (6th Cir. 1994).  By contrast, a defendant will be entitled to summary judgment where a plaintiff produces less than a preponderance, or no more than a scintilla, of evidence to demonstrate pretext.  *See Hedrick v. Western Reserve Care,* 355 F.3d 444, 461 (6th Cir.

2004) (affirming summary judgment because plaintiff "failed to demonstrate, by a preponderance of the evidence, that [employer's] proffered reason for not hiring her…was a pretext for age discrimination.") "At the pretext stage, the plaintiff's burden of production 'merges' with his ultimate burden of persuasion to show that … discrimination" motivated her termination. *Willard v. Huntington Ford*, *Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (internal citations omitted).

Pretext can be shown in one of three ways: by offering evidence that 1) the employer's stated reason had no basis in fact; 2) the stated reason did not actually motivate the employer; or 3) the stated reason was insufficient to warrant the adverse employment action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2001) (citing *Manzer*, 29 F.3d at 1084). The three-part test to show pretext "need not be applied rigidly" but rather "is a commonsense inquiry." *Blizzard v. Marion Tech. College*, 698 F.3d 275, 285 (6th Cir. 2012).

In general, Plaintiff points to five factors that she maintains prove that Upside's decision had "no basis in fact." As discussed below, she contends that temporal proximity, a change in Upside's articulated reasons, the initial lack of a written job description for the Controller position, allegedly weak contemporaneous documentation, and isolated verbal references to her pregnancy are sufficient to show pretext. However, Plaintiff offers nothing more than her own speculation to support her various hypotheses. Such conjecture is insufficient to create a genuine issue of material fact on pretext

### 1. Plaintiff's Minimal Evidence Beyond Temporal Proximity

An old adage says that timing is everything. Plaintiff first argues that she has established pretext based on the temporal proximity between the announcement of her pregnancy on February 14 and Upside's decision to eliminate her position approximately

10

6 weeks later. Although Plaintiff concedes that temporal proximity *alone* is insufficient to establish pretext, she argues that she has "other, independent evidence" that in combination with temporal proximity is sufficient. *See Seeger v. Cincinnati Bell Telephone Co.*, LLC, 681 F.3d 274, 285 (6th Cir. 2012). Plaintiff asserts that Sharp's demeanor toward her changed from a friendly tone immediately before her pregnancy announcement to a more hostile tone after she told him she was pregnant. However, the evidence on which Plaintiff relies suggests no more than a "scintilla" of pretext.

It is true that Plaintiff was not terminated for her deficient performance. However, this is not a case in which Plaintiff was a longstanding, high-performing employee who suddenly was evaluated more negatively after she became pregnant. Plaintiff was a new employee with known deficits who was expected to grow into her position. Plaintiff's undergraduate degree was in philosophy, but she earned a master's degree in accounting from DeVry University in 2016 through a combination of in person and on-line classes, while continuing to work full-time. (Doc. 18 at PageID 67, 70) She had taken no accounting courses prior to obtaining her master's degree. (*Id.* at PageID 68). The job description for her position listed the necessary "qualifications and skills" as including a bachelor's degree in accounting (or the equivalent) and ERP implementation "familiarity," which Plaintiff testified that she had. However, additional prerequisites included five years' experience in an accounting role, experience with cash and accrual accounting, job costing and manufacturing accounting expertise, with "multistate sales tax compliance and registration familiarity a bonus." (Doc. 18 at PageID 255). Plaintiff admitted she did not have *any* of those "qualifications and skills" when she was began her employment with Upside. (Doc. 18 at PageID 121-122; *Id.* at PageID 255).

By the end of her first month of employment, Upside was concerned with her ability

11

to train up to the position and meet its needs. Sharp testified that as early as February 6, 2018, 8 days *before* Plaintiff informed Defendant that she was pregnant, he believed that Upside was "in some trouble" with perceived deficiencies in her accounting abilities. (Doc. 22 at PageID 403-404). Corroborating that testimony, Upside contacted Vernovis between February 7 and February 12 in order to hire an accounting consultant to assist with training and assessing Plaintiff. An advertisement stated: "Currently they have an accountant. They are not sure if they are the right fit yet. Our consultant would also setup the proper processes, procedures and evaluate/mentor the current person who is in the role. If that person isn't the right fit, they will be looking for another resource… of which the consultant may be considered for that." Thus, the record is undisputed that Upside was "not sure" if Plaintiff would remain in the position, and required someone to help "evaluate/mentor" Plaintiff. (Doc. 22 at PageID 500, see also generally, *id.* at PageID 499-517). The record contains several exhibits that reference the need for the consultant to help "catch up on [Upside's] accounting backlog, assist in the ERP accounting transition and help [Plaintiff] while assessing whether or not she is able to execute in this role." (Doc. 22 at PageID 532-33). Regardless of Plaintiff's subjective view of her own performance, the objective record confirms Upside's concerns about Plaintiff's performance prior to any knowledge of her pregnancy.

After Upside began seeking a consultant, on February 14, Spark sent Plaintiff the following email:

> Sena,
>
> I was thinking that it might be a good idea to get a little more organized in regards to your on-boarding as I know I have not done a great job with this. I put together a training matrix that I would propose that we start working through to make sure we are getting everything that you need.

A lot of this was already on the three sheets in your office, but I wanted to get it in front of you electronically. Some of these items are going to be me training you and some of them will be Amy G.

We can talk once you have a little time.

(Doc. 22 at PageID 524).

Plaintiff characterizes this email as an admission by Sharp "that he had been deficient in his promise to train her." (Doc. 25 at 11). However, the email clearly relays that Plaintiff was underperforming, consistent with Upside's ongoing search to hire a consultant who could both train and evaluate her. Although the email refers to a new electronic version of a "training matrix" to provide a more "organized" format for training, the same email alludes to previously-provided information "already… in your office" and Plaintiff's need to "work through" the tasks with Sharp and Amy G.

Within an hour of receiving the email, Plaintiff met with Sharp and she informed him she was pregnant. The next day, Sharp sent Plaintiff a follow-up email:

Sena,

I am hoping that you take the lead in driving your training from here on out. I believe we have a pretty good list of things that you need to be proficient with. I want you to reach out to Amy G and I to schedule a time to go through the matrix and then schedule the time for us to actually train you on each of the items.

So far, I feel like you are being a little timid here. I feel like you need to ask more questions when you are unsure of what to do. There is obviously a lot on your plate here, but I don't have a good understanding of what functions within our accounting processes are getting done on a routine basis and what aren't. I am hoping the training matrix will shed a little more light on that for us all.

(Doc. 22 at PageID 529).

Plaintiff argues that the second email, after her pregnancy announcement, demonstrates pretext based on Plaintiff's subjective perception of a dramatic change in

13

tone.  She contends that Sharp suddenly reversed his admission that he was responsible for failing to train her and instead held Plaintiff responsible.  The undersigned cannot agree.  Even without any background context, the second email speaks for itself and does not exhibit the type of change in tone that Plaintiff suggests.

Defendant persuasively argues that when Plaintiff failed to act quickly after being provided the electronic training matrix, Sharp simply asked her to take the lead in scheduling time with him and Gogul for training.  Sharp testified that the company was in the midst of changing its accounting system from Quickbooks to ERP.  The record reflects that Sharp sent the follow-up email after an additional text message exchange with Langford:

> Sharp: "How much interaction are you having with Sena? I'm trying to figure out why she isn't asking questions."
>
> Langford: "Varies. Usually a couple days during the week but more frequently during the day…*meant several times a day on the days she's in contact."
>
> Sharp: "Crap. I sent her a training matrix and told her that she needs to ask Amy G and I more questions."

(Doc. 22 at PAGEID 530-31.  The February 15 email does no more than emphasize Plaintiff's need to take ownership of her own training on the matrix tasks, something that Sharp was concerned she still was not doing even after he provided her with the matrix. Considering that Plaintiff's initial deficiencies were significant enough that Upside was seeking an additional consultant beyond Langford to train and evaluate her, the subtle change in tone between the two emails cannot reasonably be viewed as evidence of pretext.

Although Upside sought to hire a consultant before learning of Plaintiff's pregnancy, Crainich did not begin work until March 5, 2018, after Upside learned Plaintiff

was pregnant.  Crainich shared an office with Plaintiff, and testified that he helped Plaintiff "learn how…to close a month properly."  (Doc. 20 at PageID 309).  Within his first two weeks, he concluded that Plaintiff was not qualified for the position.  (*Id.* at PageID 310).  He opined that she "was not aware of when and how different transactions that would come up, how they would reflect or should reflect in financial statements.  She did not know how to implement."  (*Id.*; *see also id.* at PageID 310-315, 320, 324-38; *see also* Doc. 22 at PageID 543-44; 547-49).

In contrast to Sharp's initial impression of Plaintiff, Sharp was quickly impressed with Crainich.  Crainich provided him with several new types of cash accounting reports that helped Upside better evaluate its business, that Sharp had not been aware could be generated.  Soon after hiring Crainich, Upside decided to create a permanent Controller position and hire Crainich into that role.

Plaintiff does not dispute that Crainich had accounting skills and experience that she lacked.  However, she denies that Upside created the Controller position for any legitimate business reasons.  Instead, she argues that the creation of the Controller position with its more demanding prerequisites was a pretext to terminate her based upon her pregnancy.  As evidence, Plaintiff complains that after Crainich began working, Sharp "excluded [Plaintiff] from meetings and left her off of emails."  (Doc. 25 at 11).  Considering that Crainich was hired expressly to perform tasks that Plaintiff was not hired to do (such as helping Upside transition to ERP from Quickbooks), as well as to evaluate Plaintiff, the fact that Plaintiff was excluded from emails and meetings between Sharp and Crainich over time cannot reasonably be viewed as evidence of pretext.

### 2.  Upside's Articulated Reasons Did Not Change

Plaintiff next argues that she can establish that Upside's stated reason for her

termination (the elimination of her position) was not the true reason because Upside's articulated reasons changed over time. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), amended on other grounds, 97 F.3d 833 (6th Cir. 1996); *see also Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). However, the record reflects that Upside's reasons for Plaintiff's termination have been consistent.

The termination letter stated that Upside had "reevaluat[ed] the needs of the business and the redesign of the Accounting and Finance function." (Doc. 18 at PageID 286). In response to the EEOC charge, Upside similarly stated that it had eliminated Plaintiff's position after determining it needed to hire a Controller, and that Plaintiff was not qualified to fill that position. (Doc. 22 at PageID 553).

Plaintiff does not claim that Upside reconstituted Plaintiff's former position after eliminating it. Instead, Plaintiff questions Upside's "Controller qualification" explanation as pretextual. The first job description for the Controller position listed the requirement of a CPA, which Crainich possessed but Plaintiff did not. However, in June 2019, Upside terminated Crainich and replaced him with Corey Asman, who Sharp testified had sat for the CPA exam but did not yet hold his CPA. (Doc. 22 at PageID 469-470). Plaintiff claims that the waiver of the prerequisite of a CPA in June of 2019 demonstrates that Defendant's position in March of 2018 that she was not qualified for the Controller position was "demonstrably false." (Doc. 25 at 12).

It does not. If Upside had claimed that a CPA was required in March of 2018 and then hired someone without a CPA and with comparable experience to Plaintiff, such

16

evidence might inch closer to hypothetical proof of pretext.[5]  However, the fact that Upside fired Crainich and hired a different Controller who did not possess a CPA 15 months later has no bearing on whether Upside's stated reason for not considering Plaintiff for the position of Controller was a "sham" at the time it was made. *See Bailey v. Oakwood Healthcare, Inc.*, 732 Fed. Appx. 360, 363 (6th Cir. 2018) (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012)) (holding that where an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless….").

Plaintiff also argues that Upside's assertion that Plaintiff could not provide Upside with the "high quality accounting services Upside needed" is a "vague, subjective justification" that shows pretext.  (Doc. 25 at 12).  Again, I disagree.  From nearly the outset of her employment, Upside questioned Plaintiff's "fit" and whether she could meet its needs before Defendant was aware of her pregnancy.  Plaintiff does not (and cannot) make any argument that Upside hired an accounting consultant to train and evaluate her as a pretext for pregnancy discrimination, when her employer made that decision and advertised for the position before Defendant was aware she was pregnant.

Once Crainich was hired into the consultant's position, even Plaintiff admits that he possessed skills[6] and additional years of experience that she did not, in addition to his

---

[5]Plaintiff appears to be asserting a new "failure-to-promote" claim in addition to her claim of wrongful termination.  Although the promotion arguments have been addressed *infra*, the undersigned expresses no view on whether a failure-to-promote claim is adequately stated in the complaint or in the prior EEOC charge.  With respect to the more clearly articulated termination claim, Plaintiff argues that Upside's failure to consider her for the Controller position prior to terminating her is evidence of pretext.  However, given Upside's concerns about Plaintiff's ability to execute her duties in the lower-responsibility position into which she was hired, the suggestion that its failure to consider her for promotion shows pretext is without merit.

[6]The Controller job also required experience with cash and accrual accounting, job costing and manufacturing accounting expertise, none of which Plaintiff possessed, as well as ERP implementation experience (rather than mere "familiarity"). (Doc. 22 at PageID 578).  Defendant's response to the EEOC

CPA credential. It would have been unreasonable to expect Upside to consider promoting Plaintiff to Controller over Crainich, even if the position had been open to other applicants.[7] As the undersigned recently wrote in *Leisring v. Hamilton County Clerk of Courts*, 2020 WL 155408 at *8 (S.D. Ohio April 1, 2020) (appeal pending):

> [T]he Sixth Circuit …frequently has emphasized that "employers are generally 'free to choose among qualified candidates,' and that '[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with[.]'" *O'Dell v. State*, 2018 WL 662245 (6th Cir. Feb. 1, 2018) (quoting *Bender*, 455 F.3d at 627, additional citations omitted). A court is not to act as "super-personnel department." *See Hedrick*, 355 F.3d at 462 (citations omitted). Thus, "it is inappropriate for the judiciary to substitute its judgment for that of management." *Id.*,(quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)). "Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* (internal quotation marks and citation omitted). "[W]hen qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation." *Bender*, 455 F.3d at 627 (additional citation omitted).

*Id.*; *see also Russell v. Michigan Dept. of Health and Human Services*, 2018 WL 1168981 at *9 (E.D. Mich. March 6, 2018) ("[T]he prevailing rule in this Circuit is that if an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision…, then the employee will not be able to establish pretext.").

Last, Plaintiff argues that Upside came up with a "newly fabricated justification"

---

charge stated clearly that Crainich's experience and training for the Controller position "far outweighed" Plaintiff's. (Doc. 22 at PageID 553). The response stated that Crainich had a CPA, had completed "various trainings" concerning key skills required for the Controller position, was "certified as a Charter Global Management Accountant and affiliated with American Institute of Certified Public Accountants." (*Id.*) By contrast, Plaintiff had a total of seven years of "lower-level" experience (most of which occurred prior to her receipt of an accounting degree in 2016), while "Crainich had nineteen years of work experience" including positions as "Corporate Controller, Controller, Accounting Manager, and Corporate Accountant." (Doc. 22 at PageID 553).

[7]In a failure-to-promote case, even the selection of an inferior applicant rarely will be sufficient to prove pretext. Plaintiff does not even argue that her objective qualifications were superior to those of Crainich or to those of his more recent replacement. *Compare White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393-394 (6th Cir. 2008) (holding that African-American candidate was so significantly better qualified that a factfinder could infer pretext, and that the employer *consciously* selected the less-qualified white candidate for promotion based upon discrimination).

when Sharp testified that Upside could not afford to pay both a Controller and an Accounting and Human Resources Manager as well as an Accounting Assistant. (Doc. 25 at 13).  However, Plaintiff alleged in her complaint and in her EEOC charge, and testified at her deposition, that Upside told her at the time of her termination that Upside could not afford to employ both her and Crainich. (Complaint at ¶15; *see also* EEOC Charge, Doc. 18 at PageID 289; Doc. 18 at PageID 205, 210).  In addition, Upside's response to the EEOC charge stated:

> Upside quickly realized Ms. Gadagbui was not able to handle many of the accounting aspects of her position. As a result, Mr. Sharp engaged a consultant to assist with the Company's accounting needs. Once Mr. Sharp was able to observe firsthand Ms. Gadagbui's accounting skills and the contractor's accounting skills, Mr. Sharp realized that Upside Innovations needed to hire a Controller, who was able to provide high-quality accounting services. With a Controller, the Company simply did not need an "Accounting and Human Resources Manager" who, for the most part, could only provide human resources services and low-level accounting help. The business needed higher level accounting help, not human resource services.

(Doc. 22 at PageID 552).

Upside's explanations for the elimination of Plaintiff's position in favor of hiring a Controller are entirely consistent.  "[P]roviding additional non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications." *MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 Fed. Appx. 718, 726 (6th Cir. 2012) (additional citations omitted).  Sharp's deposition testimony, that cost was considered in eliminating a position that the company "did not need," states nothing more than the obvious.

### 3. Hiring Crainich Before Finalizing the Controller Job Description Does Not Show Pretext

In a closely related argument, Plaintiff claims that Upside's reasons for terminating

rather than promoting her have no basis in fact, because at the time of her termination, "Upside had not even established the duties or required qualification of the Controller position." (Doc. 25 at 13). It is true that Upside hired Crainich before creating a formal written job description for the Controller position. But Plaintiff is wrong to assume that the failure of Upside to finalize his job description prior to hiring him somehow invalidates that decision. The record overwhelmingly supports Defendant's assertion that the Controller position was designed around the work that Crainich was actually doing – work that Gadagbui was not performing and does not claim to have been capable of producing. Crainich had greater skills and experience and the decision to hire him was based on his demonstrated ability to produce what Upside wanted at that time. The fact that the written job description was not finalized until shortly after he was hired is not evidence of pretext.

### 4. Evidentiary Support for Plaintiff's Accounting Deficiencies

Plaintiff contends that Upside failed to produce a sufficient quantity of emails to corroborate Sharp's testimony about her deficiencies "for the Accounting and Human Resources Manager position that she held, much less the Controller position." (Doc. 25 at 14). Plaintiff claims that Upside produced only a single email initiated by Sharp on March 13, 2018 discussing an accounting mistake, which Plaintiff argues that Sharp admitted was "no big deal" at the time. In the email correspondence, after Plaintiff admitted the error, Sharp replied: "No big deal, you would have caught it in a day or two anyway." (*See* Doc. 18 at PageID 281; see also id. at PageID 193-194).

However, the record includes additional documentation, including an email dated January 17, 2018 from Sharp to Plaintiff stating that he would like for her to work with him to "go through the PNC banking statement and balance it to our QB cash account" based on a noted error that was due to her failure to enter bank transactions into Quickbooks.

(Doc. 18 at PageID 264). Numerous records refer to related accounting concerns. (*See e.g.*, Doc. 18 at PageID 264-68, 279-85; Doc. 22 at PageID 499-27, 529-33, 542-49). Most compelling is the record that demonstrates that Upside's concerns led Defendant to contact a third-party placement agency *before* Defendant learned Plaintiff was pregnant to find a consultant who could help train and evaluate her. Both Crainich and Sharp testified consistently to Plaintiff's deficiencies. Plaintiff did not deny those deficiencies in her deposition testimony, but instead blamed her inability to perform on Upside's failure to provide her with adequate training. (*See* Doc. 18 at PageID 148-150).

### 5. Isolated Remarks Fail to Show Pretext

In a final attempt to establish pretext, Plaintiff points to a smattering of isolated remarks relating to her pregnancy, beginning with Sharp's verbal response to her pregnancy disclosure. *See Asmo v. Keane*, 471 F.3d 588, 594-595 (6th Cir. 2006) (holding that a supervisor's notable silence on a conference call in which all colleagues were congratulatory upon an announcement that the plaintiff was pregnant with twins reasonably could be interpreted as discriminatory speculation "regarding the impact of Asmo's pregnancy on her work" given the context of plaintiff's job "being particularly demanding of time due to travel and her announcement of not just a pregnancy, but a pregnancy of twins.").

*Asmo* is easily distinguished. Context matters. Plaintiff testified that Sharp responded to her announcement by stating that he had never had a pregnant worker before but that "we know these things happen." (Doc. 18 at PageID 152). However, Plaintiff informed Sharp of her pregnancy in a meeting after his February 14 email suggesting a need for better and more organized training. Plaintiff did not appear happy and told Langford that the pregnancy was the result of a birth control failure. Sharp

21

testified, consistent with a contemporaneous text exchange with another employee, that Plaintiff's less-than-enthusiastic announcement led to an awkward exchange.

Contemporaneous documents corroborate Sharp's testimony that his conversation with Plaintiff was awkward in part because Plaintiff shared that she was not menstruating, was breastfeeding, and did not think she could become pregnant. In response, Sharp quipped something along the lines of "Well there is quite a bit of general understanding how these things happen." (Doc. 22 at PageID 418; *see also id.* at 528). Sharp testified that he made the statement in an effort to break the tension of the awkward exchange. (*Id.*) Both on its face and in context, Sharp's response neither directly expresses nor implies any animus toward Plaintiff's pregnancy.

Plaintiff points to a second comment a month later when Plaintiff called off work because she felt sick, in which Sharp stated that he hoped her illness was not "pregnancy related." However, that statement also indicates no direct animus. The undisputed record demonstrates that Sharp made the statement out of concern, not any discriminatory animus. (Doc. 22 at PageID 419, "But it – it wasn't quite in the tone. It was – It was, you know, I hope you don't have morning sickness which is something I would say to my wife or any other person that is pregnant and isn't feeling well in the morning."). All other records, including Plaintiff's own testimony, reflect that Sharp never objected or indicated any work-related concerns when Plaintiff left to care for her children or due to illness (whether caused by pregnancy or otherwise). (*See, e.g.*, Doc. 18 at PageID 259-263; Doc. 22 at PageID 527). In a contemporaneous exchange in which Sharp told Langford that "Sena told me that she's 15 weeks pregnant….," former employee Langford responded with concern about the timing of Plaintiff's due date: "Oh wow. Busy season. I feel bad about leaving like I've left you in a mess." In contrast to Langford's concern,

Sharp responded:  "I don't feel bad about it. We will be fine…").  (Doc. 22 at PageID 527).

Plaintiff next turns her focus to a comment by Crainich about her "reliability" based on appointments taking her away from the office but again omits context.   In the referenced email to Olmstead, Crainich wrote:  "What has Kevin's [Sharp's] experience been with Sena's reliability?  I fully understand appointments and things happen that at times take you away from the office (that's anybody).  But while she's there I'm not feeling an "urgency" on her part to get caught up or things done."  (Doc. 22 at PageID 543-544). When questioned about the reference, Crainich testified:

> I had no idea, nor was it my business to know why she was leaving.  But I – I didn't see that on Sena's part.  When she were to leave, I didn't see any urgency to say, gosh, I – I left, I missed work.  I got to get this done, I got to get these financial statements done, or these bills paid or get this project done.

(Doc. 20 at PageID 321-22). In context, the comment indicates no animus towards pregnancy.  In addition, Crainich was not the decisionmaker, so his isolated comment is insufficient to create a question of fact concerning pretext.  *See Smith v. Leggett Wire Co.*, 220 F.3d at 759.

Plaintiff also complains that Sharp and/or Olmstead referred to her pregnancy during her termination meeting, when informing her that Upside would not oppose her application for unemployment because she was pregnant.   This isolated comment provides no evidence that Upside's decision to eliminate Plaintiff's position and hire a more experienced Controller was pretextual.  In sum, even if Plaintiff could establish her prima facie case, Upside still would be entitled to summary judgment because it offered facially nondiscriminatory reasons for creating the Controller position and eliminating Plaintiff's former position, which no reasonable jury could find were pretextual.

**IV.     Conclusion and Order**

Accordingly, **IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 23) be **GRANTED** on all claims, and that this case be **DISMISSED.**


                                  *s/ Stephanie K. Bowman*
                                  Stephanie K. Bowman
                                  United States Magistrate Judge